**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**JACKSON MUNICIPAL AIRPORT
AUTHORITY, ET AL.**                                              **PLAINTIFFS**

**VS.**                          **CIVIL ACTION NO. 3:16cv246-CWR-FKB**

**GOVERNOR PHIL BRYANT, ET AL.**                        **DEFENDANTS**
_____

**GOVERNOR BRYANT'S RULE 72
OBJECTIONS TO ORDER [DKT. 333]**
_____

Pursuant to Fed. R. Civ. P. 72(a) and L.U.Civ. R. 72(a)(1)(B), Phil Bryant, in his

official capacity as Governor of the State of Mississippi (Governor Bryant or the

Governor), objects to certain portions of the Court's rulings and order on plaintiffs'

motion to compel and Governor Bryant's motion for protective order [Dkt. 333].  For

the reasons more specifically set forth below, through his objections, Governor Bryant

requests an order: (1) reversing the protective order's adverse findings and disposition

with respect to the Governor's Chief of Staff Joey Songy, and prohibiting his deposition

entirely; and (2) reversing the protective order's adverse findings and disposition with

respect to Bobby Morgan and Alice Perry, and prohibiting their depositions entirely, or

at a minimum, modifying the protective order to require written discovery or Rule 31

depositions, or limit the allowable time and scope of their depositions.

## BACKGROUND

Over the course of this now two-and-a-half year old lawsuit, Governor Bryant has

turned over thousands of pages of documents, and the plaintiffs have exhausted every

legitimate means of discovering information from his Office regarding 2016 Senate Bill

2162.  That unfortunately has not deterred the plaintiffs from constantly provoking

discovery disputes to delay a final resolution of their meritless claims.

The instant dispute began almost a year before this writing.  Back then, JMAA[1] insisted on a 30(b)(6) deposition of the Governor's Office.  By agreement, on August 18, 2017, the deposition proceeded on eighteen broad topics of inquiry that JMAA picked. [*See* Dkt. 240, 240-1].  For nearly seven hours, JMAA's lawyers interrogated Drew Snyder, the Governor's then-Deputy Chief of Staff, Policy Director, and Counsel, regarding each topic and several documents—among the thousands of pages of documents produced by the Governor.

As Rule 30(b)(6) required, Mr. Snyder was fully prepared.  He met with members of the Governor's Office in advance, including Governor Bryant's Chief of Staff, Joey Songy, as well as Bobby Morgan and Alice Perry, two policy officials in the Governor's Office.  [Dkt. 259-4 at 9:19-24].  They provided Mr. Snyder all information they could recall regarding the deposition topics and previously produced documents.  [Dkt. 259-1 at ¶11, Dkt. 259-2 at ¶9, Dkt. 259-3 at ¶7].  Mr. Snyder answered all the questions.  And when the lawyers asked about things that Chief of Staff Songy, Mr. Morgan, and/or Ms. Perry could not recall, Mr. Snyder testified as much on behalf of the Governor's Office.[2]

Three months passed after the 30(b)(6) deposition.  Then JMAA demanded

---

[1]  The issues at hand only involve some of the plaintiffs, which include the entity Jackson Municipal Airport Authority, its Board of Commissioners, and its commissioners in their "official" and "individual" capacities.  This writing refers to those plaintiffs collectively as "JMAA" unless otherwise indicated.

[2]  As the record demonstrates, moreover, Chief of Staff Songy, Mr. Morgan, and Ms. Perry reviewed the portions of the 30(b)(6) testimony concerning the limited information and few communications of which they have knowledge, affirmed the accuracy of Mr. Snyder's testimony, and confirmed Mr. Snyder provided all information they could presently recall in responding to JMAA's questions at the 30(b)(6) deposition.  [Dkt. 259-1 at pp. 2-3, Dkt. 259-2 at pp. 2-3, Dkt. 259-3 at p. 2].

individual depositions of Chief of Staff Songy, Mr. Morgan and Ms. Perry.  [Dkt. 255-2].  The Governor offered to accommodate JMAA's supposed need for information through other means.  [Dkt. 255-8].  No compromise was reached.  But JMAA never noticed any depositions, or subpoenaed the targeted officials.

Instead, JMAA moved to compel Mr. Songy, Mr. Morgan, and Ms. Perry's depositions.  [Dkt. 255].  Governor Bryant opposed the motion, and countered with a motion for protective order.  [Dkt. 259, 261].  As to Chief of Staff Songy, the parties' dispute centered on the high-ranking official rule which protects qualifying officials from compelled testimony.  [Dkt. 255, 256, 259, 260, 267, 272, 273].  The controversy with respect to Mr. Morgan and Ms. Perry revolved around the lack of relevance, proportionality, and cumulative nature of information allegedly sought through their proposed depositions, and the undue burden the depositions would impose on them, and the Governor's Office.  [Dkt. 255, 256, 259, 260, 267, 272, 273].

## THE PROTECTIVE ORDER

On July 20, 2018, the Court entered a protective order denying JMAA's motion, and granting and denying, in part, Governor Bryant's motion.  [Dkt. 333].  The protective order held JMAA's motion was premature because JMAA never noticed any depositions.  [Dkt. 333 at p. 1].  Then, after recounting some facts and the procedural background, it addressed the Governor's motion for protective order in two parts.

Regarding Chief of Staff Songy, the protective order held he qualifies as a "high-ranking" government official entitled to protection against compelled testimony.  [Dkt. 333 at p. 5].  The order analyzed whether the Chief of Staff "has first-hand knowledge related to the claims being litigated and other persons cannot provide the necessary

information." [Dkt. 333 at p. 4]. Under that formulation of the high-ranking official standard, and based on a few parts of Mr. Snyder's prior 30(b)(6) testimony, the protective order concluded JMAA met its burden to force Chief of Staff Songy's deposition. [Dkt. 333 at pp. 5-7]. However, the order limited the deposition to two hours, and restricted the permissible scope of inquiry to two topics borrowed from the 30(b)(6) notice. [Dkt. 333 at p. 8].

With respect to Mr. Morgan and Ms. Perry, the protective order identified a handful of documents and emails they either authored, or that mentioned them, and a few portions of Mr. Snyder's testimony involving the two policy officials. [Dkt. 333 at pp. 9-10]. It then found each had relevant personal knowledge about the airport and S.B. 2162, and their depositions would not be disproportionate to the needs of the case, or constitute unreasonably cumulative or duplicative discovery. [Dkt. 333 at pp. 10-11]. It further concluded Mr. Morgan and Ms. Perry's demanding schedules and responsibilities did not prove the depositions would subject them or the Governor's Office to an undue burden. [Dkt. 333 at p. 10]. Based on those findings, the protective order denied any relief with respect to Ms. Morgan and Ms. Perry. [Dkt. 333 at p. 11].[3]

---

[3] Additionally, the protective order's concluding paragraph specifically granted Governor Bryant's request that any depositions of Chief of Staff Songy, Mr. Morgan, and Ms. Perry be subject to the Court's previously entered protective order [Dkt. 239]. [Dkt. 333 at p. 11]. Governor Bryant disagrees that the depositions should be allowed, as explained below, but has no objection to the Court's holding that paragraphs 4-6, 12, and 13 of the prior order apply to the depositions, if they are allowed in any fashion.

**OBJECTIONS**

**I.      The High-Ranking Official Rule Bars Chief of Staff Songy's Deposition.**

The Fifth Circuit's "settled rule" is "that exceptional circumstances must exist before the involuntary depositions of high agency officials are permitted." ***In re F.D.I.C.***, 58 F.3d 1055, 1060 (5th Cir. 1995) (internal quotes omitted).  It is likewise "the settled rule across the circuits." ***Coleman v. Schwarzenegger***, 2008 WL 4300437, at *2 (E.D. Cal. Sept. 15, 2008) (three judge court).[4]

As page four of the protective order acknowledged, a two-step inquiry is required. Step one obligates the targeted party to prove an official is "sufficiently high-ranking to invoke the deposition privilege." ***Thomas v. Cate***, 715 F.Supp.2d 1012, 1049 (E.D. Cal. 2010).  If the official qualifies, for step two, the "burden shifts to the party seeking to depose the high-ranking official" to prove exceptional circumstances justify the deposition. ***Id.***

**A.      Chief of Staff Songy is a high-ranking official.**

On step one, the protective order started in the right direction.  It held Chief of Staff Songy is a high-ranking official.  [Dkt. 333 at p. 5].  Un-rebutted record evidence proved the Chief of Staff qualified due to his "demanding schedule and substantial list of responsibilities." [Dkt. 333 at p. 5 (citing Dkt. 259-1 at 1-2)].  Case law, as the protective

---

[4] *Citing* ***Bogan v. City of Boston***, 489 F.3d 417, 423 (1st Cir. 2007); ***Stagman v. Ryan***, 176 F.3d 986 (7th Cir. 1999), *cert. denied*, 528 U.S. 986 (1999); ***In re United States (Kessler)***, 985 F.2d 510, 512 (11th Cir. 1993), *cert. denied sub. nom.*, ***Faloon v. United States***, 510 U.S. 989 (1993); ***Simplex Time Recorder Co. v. Secretary of Labor***, 766 F.2d 575, 586 (D.C. Cir. 1985); ***Sweeney v. Bond***, 669 F.2d 542 (8th Cir. 1982), *abrogated on other grounds by* ***O'Hare Truck Service, Inc. v. City of Northlake***, 518 U.S 712 (1996); ***Kyle Engineering Co. v. Kleppe***, 600 F.2d 226, 231 (9th Cir. 1979).

order further recognized, backs-up that finding.  [Dkt. 333 at p. 5 (citing **F.D.I.C.**, 58 F.3d at 1060; **Coleman**, 2008 WL 4300437, at *4; **New York v. Oneida Indian Nation of New York**, 2001 WL 1708804, at *3 (N.D. N.Y. Nov. 9, 2001))].[5]

### B.    The protective order applied an incomplete standard.

At step two, the analysis took a wrong turn.  The problem started with reducing JMAA's burden of proof to a mere showing that Chief of Staff Songy "has first hand knowledge related to the claims being litigated and other persons cannot provide the necessary information."  [Dkt. 333 at p. 4 (internal quotes omitted)].  Then, compounding that error, the protective order highlighted a few issues in snippets of Mr. Snyder's 30(b)(6) testimony, and concluded JMAA satisfied its minimal burden.  [Dkt. 333 at p. 7].

Compelling a high-ranking official's deposition requires much more than finding the official has allegedly relevant first hand information, and that the information is arguably otherwise unavailable.  In at least three ways, the protective order's conclusions resulted from misapplying the appropriate proof standard, and were therefore contrary to law.  See **Ambrose-Frazier v. Herzing, Inc.**, 2016 WL 890406, at *2 (E.D. La. Mar. 9, 2016) ("A legal conclusion is contrary to law when the

---

[5]  Numerous other federal courts have further recognized that state officials who are arguably lesser-ranking than Chief of Staff Songy qualify as "high ranking officials" for purposes of evaluating whether they may be compelled to testify.  See, e.g., **Harding v. County of Dallas, Texas**, 2016 WL 7426127, at *7-8 (N.D. Tex. Dec. 23, 2016) (county judge and commissioners); **Wilson v. City of Wilmington**, 2015 WL 4594510, at *1-2 (D. Del. July 29, 2015) (mayor and city councilperson); **Warren v. Washington**, 2012 WL 2190788, at *2 (W.D. Wash. June 14, 2012) (prison superintendent); **Jameson v. Oakland County**, 2011 WL 219555, at *2 (E.D. Mich. Jan. 24, 2011) (county sheriff); **Adler v. Pataki**, 2001 WL 1708801, at *1-2 (N.D. N.Y. Nov. 13, 2001) (state legislator); **Warzon v. Drew**, 155 F.R.D. 183, 185 (E.D. Wis. 1994) (head of state agency).

magistrate fails to apply or misapplies relevant statutes, case law, or rules of procedure.").

First, the protective order did not apply the heightened relevance standard that case law prescribes. A high-ranking official's deposition is not warranted merely because he or she may know information "related to" a party's claims. For example, in *F.D.I.C.*, the district court used the same lightweight relevance inquiry as the protective order here. The lower court ordered three high-ranking officials to testify essentially because discovery responses indicated the officials had knowledge of matters "relevant to the dispute," and the party seeking their depositions "represented that it has been unable to obtain the information through other means." 58 F.3d at 1061. The Fifth Circuit held that analysis did not demonstrate the district court adequately "considered the high-ranking status of the deponents, the potential burden that the depositions would impose on them, or the substantive reasons for taking the depositions." *Id.* at 1060. In fact, the district court's focus on the mere alleged relevance of the officials' first-hand knowledge, and inability to obtain the information elsewhere, was so deficient that the Fifth Circuit granted mandamus relief blocking the depositions. *Id.* at 1062-63.[6]

Like *F.D.I.C.*, other courts recognize a heightened relevance and alternative

---

[6] Oddly enough, at one point, the protective order acknowledged *F.D.I.C.* and its holding that the high-ranking official test requires an evaluation of "the substantive reasons for taking the deposition." [Dkt. 333 at p. 7 (quoting *F.D.I.C.*, 58 F.3d at 1060)]. But then, in circular fashion, the order concluded JMAA's "substantive reason for taking Songy's deposition is obvious: the 30(b)(6) deposition revealed that Songy is the only Governor's Office employee with first-hand knowledge of certain discoverable information." [Dkt. 333 at pp. 7-8]. *F.D.I.C.* obviously rejected the notion that mere first-hand knowledge is a sufficient "substantive reason" to compel a high-ranking official's deposition.

source standard must be satisfied to compel a high-ranking official's deposition.  On the relevance front, the information sought has to be both relevant and "essential to the case at hand."  ***Thomas***, 715 F.Supp.2d at 1049; *see also*, *e.g.*, ***In re United States (Holder)***, 197 F.3d 310, 314 (8th Cir. 1999) (the party seeking a high-ranking official's deposition must "establish at a minimum that the [high-ranking official] possess[es] information essential to his case which is not obtainable from another source"); ***Warzon***, 155 F.R.D. at 185 (party targeting a high-ranking official must prove both "that the particular official's testimony will likely lead to the discovery of admissible evidence and is essential to that party's case").  That means, as one district court aptly put it, the high-ranking official standard "requires something greater than the normal Rule 26 relevancy standard."  ***Robinson v. City of Philadelphia***, 2006 WL 1147250, at *2 (E.D. Pa. Apr. 26, 2006).

Here, the protective order failed to require proof that anything Chief of Staff Songy could testify about is essential to anyone's claims.  Without detailing any particular reasons, the order instead apparently just assumed the Chief of Staff's testimony could be "related to" something.  Applying that standard was contrary to law.

Second, the protective order's relaxed methodology diminished JMAA's obligation to prove it seeks essential information that cannot "reasonably be obtained from other sources."  ***Thomas***, 715 F.Supp.2d at 1049.  The "other source" element requires more than showing an attempt to obtain allegedly needed information from one different source.  A party seeking a high-ranking official's testimony must establish no other possible source is available.  *E.g.*, ***Holder***, 197 F.3d at 314 ("If other persons can provide the information sought, discovery will not be permitted against such an

official."); **City of Ft. Lauderdale v. Scott**, 2012 WL 760743, at *4 (S.D. Fla. Mar. 7, 2012) (the party seeking a high-ranking official's deposition must "demonstrate what efforts have been made to determine whether the information is otherwise available and the extent to which [its] efforts failed to uncover such information") (internal quotations and citation omitted).  In failing to adequately hold JMAA to account for the "other source" element, the protective order's analysis was contrary to law.

Third, the protective order did not consider or require JMAA to pursue less burdensome means.  Akin to the "other source" element, the high-ranking official test requires a deposition's proponent to prove the essential information sought "is not available through less burdensome means or alternative sources."  **Thomas**, 715 F.Supp.2d at 1049.  "Less burdensome means" include written discovery and/or a Rule 31 deposition on written questions, not a live deposition.  *E.g.*, **Summerville v. New Jersey State Police**, 2018 WL 401785, at *3 (D. N.J. Jan. 11, 2018) (requiring plaintiffs to take deposition on written questions under Rule 31); **Thomas**, 715 F.Supp.2d at 1049 (allowing court-approved interrogatories); **Buono v. City of Newark**, 249 F.R.D. 469, 472 n. 2 (D. N.J. 2008) (requiring plaintiff to utilize written discovery).  The protective order only faulted Mr. Snyder's 30(b)(6) deposition as a suitable alternative source for Chief of Staff Songy's testimony, as discussed more below, because Mr. Snyder did not provide a few highly-specific details about communications, such as when and whether conversations occurred.  Interrogatories or a deposition on written questions are ideal for discovering those allegedly needed details.  Overlooking the "less burdensome means" element of JMAA's burden of proof was contrary to law.

### C.    The protective order's fact-finding was clearly erroneous measured against any standard.

The protective order should have held JMAA to the burden of proof that *F.D.I.C.* and other federal courts require.  But, to make matters worse, whether traveling under those authorities or the diminished proof burden it applied, the order's factual findings were clearly erroneous.  *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (A factual finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed") (internal quotes omitted).

The order set up a few examples of Chief of Staff Songy's "first hand knowledge related to the claims being litigated in this case," and then knocked them down with bits and pieces of Mr. Snyder's 30(b)(6) testimony which, according to the order, revealed issues where Mr. Snyder did not "provide the necessary information to plaintiffs."  [Dkt. 333 at pp. 5-7].  Reviewed both individually and collectively, and in light of the entire record, none of the examples proved Chief of Staff Songy has "first hand knowledge related to the claims being litigated and other persons cannot provide the necessary information"—much less satisfied the other appropriate elements of JMAA's evidentiary burden.

The initial example of Chief of Staff Songy's allegedly relevant "first hand knowledge" was his thoughts, starting in 2014, about improving the Jackson-Evers Airport's governance structure.  [Dkt. 333 at p. 5].  As the protective order recounted, two sentences in Governor Bryant's briefing acknowledged Chief of Staff Songy had those thoughts:

> "[i]n 2014, while serving as the Governor's economic development policy advisor, Mr. Songy thought changing Jackson-Evers' governing structure could help the struggling airport. By May 2015, members of the Governor's Office internally discussed the concept of improving the airport's governance structure."

[Dkt. 333 at p. 5 (quoting Dkt. 260 at 11)]. That isolated quote, however, does not connect the Chief of Staff's concept to any claims here. The protective order paid no attention to the rest of the Governor's statement and record evidence on point. The briefing "admission" continued:

> But Mr. Songy's idea had nothing to do with S.B. 2162, or the Legislature's intent behind it.
>
> To the contrary, as JMAA already well-knows, the Governor's Office had nothing to do with crafting S.B. 2162. [[Dkt. 259-4] at 119:24-120:4]. Before the 2016 Session, neither Mr. Songy nor anyone else in the Governor's Office discussed the idea with any legislators:
>
>> [t]here were not conversations with Legislators about the - - you know, the - - general concept that - - general concept - - that Joey Songy, you know, came up with. We read it in the newspaper, you know that - - read a news story that Josh Harkins was introducing legislation related to the airport. It wasn't something that was flowing from what Joey Songy was doing.
>
> [*Id*. at 119:14-23]. Mr. Songy had no conversations about the airport with any legislators, much less S.B. 2162's sponsors, before the airport legislation was made public around January 2016. [*Id*. at 117:22-118:10; 122:5-123:6].
>
> No connection between Mr. Songy's "idea" and S.B. 2162 exists. The concept was never discussed outside the Governor's staff before early-2016. The fact that Mr. Songy thought about policies designed to improve the airport's economic development value in 2014 has no bearing on the Legislature's motivations behind S.B. 2162. Personally shaking Mr. Songy down about his idea, beyond the existing 30(b)(6) testimony on the topic, is not essential to this case.

[Dkt. 260 at pp. 11-12]. In addition to those overlooked details, the protective order did

not explain why Chief of Staff Songy's pre-2016 concept "related to" any particular claim in JMAA's complaint.  And it did not directly find Mr. Snyder's 30(b)(6) testimony failed to "provide" JMAA with "the necessary information" about the concept.  Instead, to support its conclusions, the protective order shifted to five issues regarding potential communications between Chief of Staff Songy and third-parties, and then charged Mr. Snyder's 30(b)(6) testimony with not providing enough detail.

    None of the communications issues justifies compelling Chief of Staff Songy to testify.  The first issue zeroed in on simply when a conversation took place: "Snyder testified that Songy and Harkins met 'after it became public that Harkins was planning to propose airport legislation,' but did not state whether the meeting took place before or after SB 2162 was actually introduced."  [Dkt. 333 at p. 5].  That timing issue does not prove JMAA needs the Chief of Staff's deposition to uncover any "necessary information" unobtainable from another source.  JMAA, and everybody else, already knows the supposedly crucial detail of when the conversation took place.

    As the transcript shows, Mr. Snyder explained Chief of Staff Songy's recollection of the substance of his telephone call with Senator Harkins and when it occurred:

> Q: [Counsel] Did Joey Songy discuss the concept directly with Senator Harkins at any point in time?
>
> [Counsel]: Object to the form.
>
> The Witness: Yes.
>
> Q: [Counsel] Okay.  Tell me about those discussions.
> A: After Senator Har - - after it became public that Senator Harkins was planning to propose airport legislation, he called - - he called Joey Songy, and they talked about - - they talked about his - - that he was planning to do it, and I think Joey said that "Oh, I had been thinking about doing this, too.  We had been talking about doing this."  And but there - - that was the

- - you know, that was generally the extent of the conversation as far as he can remember.

Q: "He" being?
A: Joey Songy.

Q: About when did this conversation take place?
A: I think it would have been in early January after the legislation was - - you know, after the news story came out about the Har - - Senator Harkins' plan to introduce legislation.

Q: So is the Governor's Office testimony that between the time that Joey Songy first came up with this idea about the State pursuing control of the airport at some point in late March or early April of 2014, until early January 2016, that Mr. Songy never had any conversations with Senator Harkins about this concept of the State pursuing control?

[Counsel]: Object to the form.

The Witness: Yes.

[Dkt. 259-4 at 120:11 - 121:20].  There is no genuine issue over "whether the meeting took place before or after SB 2162 was actually introduced."  [Dkt. 333 at p. 5].  The allegedly relevant call took place in early January 2016.  [Dkt. 259-4 at 121:5-10].  S.B. 2162 was introduced in early February 2016.[7]  Chief of Staff Songy's deposition is unnecessary to resolve that timing issue.

The next communications-related issue focused on an email exchange between Representative Monsour and members of the Governor's Office.  Citing the email, the protective order made much of whether any related conversation involving Chief of Staff Songy and Monsour occurred in mid-March 2016:

On March 16, 2016, Representative Monsour asked to speak to the Governor, telling the Governor's Office that "there is an issue with the

---

[7]  *See* 2016 Senate Bill 2162 - History of Actions, available on-line at: <http://billstatus.ls.state.ms.us/2016/pdf/history/SB/SB2162.xml> (last accessed Aug. 3, 2018).

> Jackson Airport." [255-6] at 1.  The Governor was unavailable to speak
> with Representative Monsour that day. [255-6] at 1.  When Snyder was
> asked whether anyone from the Governor's Office had been able to speak
> with Representative Monsour, Snyder testified, "I think Joey [Songy] may
> have talked to him, but . . . I don't know." [259-4] at 39-40.

[Dkt. 333 at p. 6].  As Mr. Snyder's testimony elsewhere proved, whether or not a

communication between Monsour and the Chief of Staff took place was irrelevant.

Monsour's request actually had nothing to do "with the Jackson Airport":

> Q: Aside from those communications, any other communications during
> that time period?
> A: There was an e-mail that - - regarding - - indicated that Representative
> Alex Monsour wanted to talk to the - - wanted to see the Governor about
> the - - about the airport.  I think they ended up meeting, but it was - - it
> ended up not being about the airport.
>
> Q: Do you recall when that took place during that time frame?
> A: It would have been in, you know, sometime in - - in mid-March.
>
> Q: 2016?
> A: 2016.

[Dkt. 259-4 at 127:9-22].  An alleged need to probe Chief of Staff Songy about a possible

communication, which did not even involve the airport, does not justify his deposition.

The protective order next turned to passages of 30(b)(6) testimony which it said

"showed a lack of knowledge regarding other conversations Songy may have had with

other legislators."  [Dkt. 333 at p. 6].  It premised that statement on two possible

communications:

> when asked if Songy had any communications with any sponsors of a
> companion House bill related to the Jackson-Evers Airport, Snyder
> testified, "I don't - - don't recall." [259-4] at 36.  And when asked whether
> Songy had talked with Senator Hor[hn] about SB 2162, Snyder testified, "I
> can't say with certainty . . . ." *Id.* at 38.

[Dkt. 333 at p. 6].  There's more context the order apparently overlooked.  According to

the transcript, the questions put to Mr. Snyder really only involved timing.

With respect to the "companion House bill," it is no wonder that Mr. Snyder was not familiar with the subject.  JMAA did not think the subject was worthy of including in the 30(b)(6) notice's long list of topics.  [Dkt. 240-1].  In any event, the protective order's cited exchange was really about whether or not any communications with the companion House bill's "sponsors" took place prior to January 2016:

> Q: Does the Governor's Office have any knowledge of Mr. Songy having any communication with any of the sponsors for the companion House Bill related to the Jackson-Medgar Evers Airport?
> A: At what - - is there a date?
>
> Q: Prior to early 2016.  Excuse me.
> A: Prior to January 2016, I'm not - - not familiar.  Yeah, I don't - - don't recall.

[Dkt. 259-4 at 123:25 - 124:7].  The issue regarding a communication with Senator Horhn was similarly yet another time-frame question over whether or not a possible communication specifically occurred in mid-March 2016:

> Q: Do you recall when that took place during that time frame?
> A: It would have been in, you know, sometime in - - in mid-March.
>
> Q: 2016?
> A: 2016.
>
> Q: Any other communications during that time period?
> A: I think Senator Hor[hn] said - - talked to Joe - - mentioned - - mentioned something to Joey Songy about the - - about the Bill, but I don't - - I can't say with certainty, you know, if that was within the time period.

[Dkt. 259-4 at 127:17 - 128:4].  These examples were, all told, just a couple of random timing issues.  They do not support requiring Chief of Staff Songy to sit for a deposition.

The final issue dealt with a possible conversation involving Chief of Staff Songy and the Madison County Board of Supervisors' Board Attorney.  The protective order

framed the issue as follows:

> Snyder testified that "Joey Songy *may* have talked to [Madison County
> Board of Supervisors Attorney] Katie Snell" about SB 2162. [266-1] at 4
> (emphasis added). Snyder stated that while he "d[id]n't want to speculate
> for [Songy]," he thought that Songy and Snell may have talked about the
> "proposal [under SB 2162] to expand the airport to include regional
> representation, . . . [which] would include the Madison County Board of
> Supervisors as one of the appointing authorities." [266-1] at 4-5. Snyder
> was then asked separate questions about when this communication
> occurred, whether other people were present, and whether it was on the
> telephone or in person. *Id.* at 5-6. In response to each of these questions,
> Snyder testified, "I don't know."

[Dkt. 333 at pp. 6-7 (alterations and emphasis in original)]. Mr. Snyder's actual

testimony was:

> Q: [Counsel] What about anyone at the Governor's Office?
> A: Joey Songy may have talked to - - to Katie Snell that there was a - - at
> some point that there was a Bill, but I'll - - it - - there weren't - - there
> weren't substantive conversations, as far as - - as far as he can remember.
>
> Q: You said they may have talked, that there was a Bill. What did they
> discuss about the Bill?
> A: He doesn't remember discussing the substance of the legislation. I
> think that - - he didn't want to speculate - - and I - - I don't want to - - I
> don't want to speculate for him. I think, you know - - there could have - -
> he recalled that there might have been - - that to the extent they talked,
> that there's a regional, there's this proposal to expand the airport to
> include regional representation, and that would include the Madison
> County Board of Supervisors as one of the appointing authorities.
>
> ***
>
> Q: [Counsel] When did the communication take place with Mrs. Snell?
> A: I'm not sure. I don't know.
>
> Q: And was the communication only between Mrs. Snell and Mr. Songy or
> were there other persons involved?
> A: I don't know.
>
> Q: Other than the - - other than the - - the discussion you mentioned of the
> Bill, were there any other topics that were talked about related to the
> operation of the airport in that conversation?

[Counsel]: Object to the form.

The Witness: I don't know.

Q: [Counsel] And are there any documents that front this communication?

[Counsel]: Object to the form.

The Witness: No.

Q: [Counsel] So was it - - was it a telephone communication or was it in-person?
A: I don't know.

[Dkt. 266-1 at 53:11 - 55:16].  The significant testimony was not, as the protective order found, that Mr. Snyder did not know enough "necessary information" or "didn't want to speculate" for Chief of Staff Songy.  [Dkt. 333 at p. 6].  The critical points were that any conversations between the Chief of Staff and Mrs. Snell "were not substantive conversations, as far as [Songy] can remember," and the Chief of Staff "doesn't remember discussing the substance of the legislation."  [Dkt. 266-1 at 53:11-23].  Considering those omitted facts, Mr. Snyder's testimony hardly supports a conclusion that Chief of Staff Songy's deposition is necessary to explore mundane details of a non-substantive conversation that may or may not have ever taken place.

In summary, based on the entire factual record, the protective order's support for requiring Chief of Staff Songy to testify boils down to five allegedly leftover issues from Mr. Snyder's 30(b)(6) deposition:

• Did Chief of Staff Songy's call with Senator Harkins in early January 2016 occur before or after S.B. 2162 was introduced in early February 2016?

• Did Chief of Staff Songy talk to Representative Monsour in mid-March 2016 about Monsour's request for a meeting that had nothing to do with the airport?

• Prior to January 2016, did Chief of Staff Songy communicate with any sponsors

of 2016 House Bill 2171?

　　• Did Senator Horhn mention something about S.B. 2162 to Chief of Staff Songy in mid-March 2016?

　　• When did a possible but non-substantive conversation between Chief of Staff Songy and Katie Snell about S.B. 2162 take place, and were other persons present, did the conversation involve other topics regarding the operation of the airport, and was the conversation in-person, or on the telephone?

Some of these issues obviously are not open issues.  Most of them were not significant enough for JMAA's lawyers to ask follow-up questions at the deposition.  None of them are relevant (much less essential) to any claims in this case.  And, even if so, the information is already known, or can easily be obtained by JMAA through other sources or less intrusive means.  The protective order erred in its fact-finding, and should have fully prohibited Chief of Staff Songy's deposition under any conception of the high-ranking official standard.

## II.　The Cumulative Nature of Mr. Morgan and Ms. Perry's Proposed Depositions, as well as the Undue Burden They Will Cause, Warrant Rule 26(c) Relief.

　　Unlike its high-ranking official analysis, the protective order acknowledged the correct Rule 26 standards governing Governor Bryant's request to prohibit Mr. Morgan and Ms. Perry's depositions.  But its fact-finding with respect to the cumulative nature of their proposed testimony, the undue burden the depositions will cause, and its conclusion to allow the depositions without any limitation, was clearly erroneous in light of the full record.

　　With respect to Ms. Perry, the protective order identified a two-page memorandum, a corresponding email, and a half-page of 30(b)(6) testimony to conclude she "was involved in matters pertaining to the Jackson-Evers Airport and SB

2162." [Dkt. 333 at pp. 9-10]. More precisely, the extent of Ms. Perry's involvement, as those items themselves demonstrate, was (1) one telephone call about the airport with the Southwest Airlines governmental affairs director in January 2016, and (2) being copied on a memorandum and one related email approximately a month later.

JMAA's lawyers only asked Mr. Snyder a few superficial questions about Ms. Perry's participation in the call and memorandum. [Dkt. 259-4 at 148:7 - 149:3]. Their lack of interest in those things at the 30(b)(6) deposition belies JMAA's claimed need to depose her. Further, as the record establishes, Ms. Perry reviewed the memorandum and 30(b)(6) testimony, confirmed their accuracy, and testified she has no present recollection of anything about the call and memorandum beyond what the documentation says and Mr. Snyder already covered. [Dkt. 259-3 at p. 2]. Given her minimal (at best) relevant knowledge, which the record proves is exhausted, the protective order should have prohibited Ms. Perry's deposition as cumulative and duplicative.[8]

Regarding Mr. Morgan, it is true that, due to his particular responsibilities with the Governor's Office, he was more "involved in issues related to the Jackson-Evers Airport and S.B. 2162" than Ms. Perry. The protective order based that finding on evidence that Mr. Morgan (1) participated in the January 2016 call with a Southwest representative and authored the memorandum about it, (2) attended a few meetings

---

[8] On the undue burden point as to Ms. Perry, her declaration regarding her governmental duties and responsibilities was accurate when executed over six months ago (along with everything else in it). [*See* Dkt. 259-3 at pp. 1-2]. However, Ms. Perry recently retired from state service. The Governor asserts she should not be required to testify for the other reasons stated herein and in his prior briefing, but acknowledges Ms. Perry's now current job status mitigates the burden her deposition would cause.

involving the airport in 2016, (3) was assigned to monitor S.B. 2162 during the 2016 Session, and (4) may have told Senator Harkins he was monitoring the bill.  [Dkt. 333 at pp. 9-10].  But Mr. Snyder's testimony addressed those issues, and, like Ms. Perry, the record proves Mr. Morgan reviewed his memorandum and the 30(b)(6) testimony, verified their accuracy, and swore he has no present recollection of anything about his communications and memorandum that Mr. Snyder's testimony and the document did not reveal.  [Dkt. 259-2 at pp. 2-3].

The protective order erroneously brushed aside these facts by casting Mr. Snyder as an inadequate source for JMAA's allegedly needed information: "Much of Snyder's 30(6)(6) deposition testimony about Morgan's and Perry's actions and communications was based on what Morgan and Perry told him, not on his own personal knowledge." [Dkt. 333 at p. 10].  But how could Mr. Snyder otherwise testify for the entire Governor's Office about eighteen deposition topics, encompassing documents and verbal communications over a two-and-a-half-year span?  The fact that Mr. Snyder testified to information Mr. Morgan and Ms. Perry told him, as opposed to providing their "own personal knowledge," does not render it inadequate.  Testifying to other people's personal knowledge is what Rule 30(b)(6) requires.  *See **Wicker v. Lawless***, 278 F.Supp.3d 989, 1000 (N.D. Ohio 2017) (under Rule 30(b)(6), "the organization or agency must designate an individual or individuals to testify on its behalf . . . about information known or reasonably available to the organization. . . . It is well-established that an organization must thereafter produce a witness knowledgeable about the subjects in the notice and to prepare that witness to testify not just to his own knowledge, but the [organization's] knowledge") (internal quotes and citations omitted).

And, here, the fact that JMAA has already been provided Mr. Morgan's known information proves requiring him to testify would be cumulative and duplicative.

In evaluating the undue burden a deposition will impose on Mr. Morgan and the Governor's Office, the protective order dismissed the proof of Mr. Morgan's duties and responsibilities, and found "there has been no showing that [he is] so busy as to be unable to appear at a deposition." [Dkt. 333 at p. 10]. Governor Bryant's undue burden point is not that Mr. Morgan cannot provide a deposition, if forced to make time for it.

The critical points here are that requiring Mr. Morgan's deposition will interfere with his day-to-day tasks and obligations, and unduly burden him. Moreover, requiring his deposition will unduly burden the Governor's Office as a whole. Disgruntled litigants often sue officials over state actions they do not like. Because of his Chief Executive role, the Governor is constantly named as a defendant in official capacity lawsuits and involved in state policy-related litigation. [*See* Dkt. 259-1 at ¶15]. At the same time, merely suing Governor Bryant, or any future Governor, over the Legislature's intent behind its enactments is not a license for litigants to force the Governor's staff to stop everything they do to prepare for and attend depositions. Routinely allowing on-demand and unfettered depositions of the Governor's policy officials in circumstances like this case—where the information JMAA allegedly seeks is already known or easily otherwise obtainable—creates an inherent undue burden, and a dangerous and unjustified precedent in future cases.

JMAA has never said, and cannot explain, how something Mr. Morgan can testify about will advance any live claim in this lawsuit. That, along with the record which proves that Mr. Morgan's known information has been disclosed, and that a deposition

will interfere with his and the Governor's Office's official duties and responsibilities, proves Mr. Morgan's deposition will create an undue burden.  The protective order erred in holding otherwise.

Finally, and alternatively, given all the circumstances here, if Mr. Morgan and/or Ms. Perry must somehow be deposed, then the protective order should have at least required JMAA to pursue their testimony through written discovery, Rule 31 depositions, or at least put limitations on their time and scope.  As the record evidence discussed above proves, the extent of their knowledge about anything that could be relevant here is limited.  The things JMAA says they would be required to testify about are few.  The depositions, and preparing for them, will be burdensome.  And, if JMAA truly has only legitimate reasons for seeking the testimony, it should have no problem with proceeding with written discovery, Rule 31 depositions, or at least under time and scope limitations which conform with JMAA's stated motivation to cross-examine Mr. Morgan and Ms. Perry about a few communications and documents.

## CONCLUSION

For the reasons explained, Governor Bryant requests an order completely barring any deposition of Chief of Staff Songy.  The Governor further requests that the order prohibit Mr. Morgan and Ms. Perry's proposed depositions, or alternatively, require JMAA to pursue the information it allegedly needs from them through written discovery, Rule 31 depositions, or, at a minimum, limit both the scope of their depositions to non-privileged communications in 2016 with individuals regarding S.B. 2162 or the management or operation of the Jackson-Evers Airport, and the depositions' time to no more than two hours.

THIS the 3rd day of August, 2018.

Respectfully submitted,

GOVERNOR PHIL BRYANT

By:     JIM HOOD, ATTORNEY GENERAL

By:     S/Justin L. Matheny
        Justin L. Matheny (Bar No. 100754)
        Krissy C. Nobile (Bar No. 103577)
        Office of the Attorney General
        P.O. Box 220
        Jackson, MS 39205
        Telephone: (601) 359-3680
        Facsimile: (601) 359-2003
        *jmath@ago.state.ms.us*
        *knobi@ago.state.ms.us*

        Whitney H. Lipscomb (Bar No. 104326)
        Office of Governor Phil Bryant
        550 High Street
        Jackson, MS 39201
        Telephone: (601) 359-3150
        Facsimile: (601) 359-3741
        *whitney.lipscomb@governor.ms.gov*

        *Counsel for Governor Phil Bryant*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document has been filed with the Clerk of Court using the Court's ECF system and thereby served on all counsel of record who have entered their appearance in this action to date.

THIS the 3rd day of August, 2018.

                        S/Justin L. Matheny
                        Justin L. Matheny