IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

JACKSON MUNICIPAL AIRPORT
AUTHORITY, et al.,

                                   *Plaintiffs*,

*v.*                                                CAUSE NO. 3:16-CV-246-CWR-ASH

TATE REEVES, et al.,

                                   *Defendants*.

## ORDER

Before the Court is a motion to dismiss filed by Governor Tate Reeves and Lieutenant Governor Delbert Hosemann (together, "the State Defendants"). Docket No. 475. Rankin County has filed an identical motion, Docket No. 477, while Madison County has not filed anything. The plaintiffs oppose the motions.

After considering the factual allegations, arguments of counsel, and applicable law, the motions will be granted in part and denied in part.

## I.    Factual and Procedural History

The City of Jackson, Mississippi owns and operates the Jackson–Medgar Wiley Evers International Airport. In this suit, a handful of Jackson citizens are challenging a state law that takes the airport and transfers it to a new entity controlled by the Governor, Lieutenant Governor, and two neighboring counties.

The plaintiffs claim the transfer is a racially-motivated effort to take land and assets of the City of Jackson—and its majority-Black citizenry—and give them to mostly white

politicians who need only be responsive to white people. The plaintiffs observe that seven of the nine members of the new entity's board would be appointed by the Governor, Lieutenant Governor, Rankin County, and Madison County. Only two of the nine members would be appointed by the City of Jackson. "The totality of circumstances," the plaintiffs conclude, "demonstrates the City and its citizens and taxpayers have been invidiously excluded because of race, in whole or in part, from any control of its Airport." Docket No. 473 at 45.

The airport takeover law was passed by the Mississippi legislature and signed into law by then-Governor Phil Bryant in 2016. It is codified at Mississippi Code § 61-3-6. This case began shortly thereafter. The litigation is now entering its ninth year, owing to a variety of disputes that have played out here and in the U.S. Court of Appeals for the Fifth Circuit.

All parties agreed to halt implementation of § 61-3-6 during the pendency of this suit. *See Ex parte Young*, 209 U.S. 123, 159-60 (1908). As a result, Jackson's airport is still owned and operated by the City through the Jackson Municipal Airport Authority (JMAA).

JMAA might in fact continue to operate the airport for years to come. That is because after the case wraps up here, there will likely be another appeal to the Fifth Circuit and perhaps a petition for U.S. Supreme Court review. And if all that litigation ends with a victory for the defendants, there will be an administrative process in Washington, D.C., in which the Federal Aviation Administration (FAA) decides whether to approve a transfer from JMAA to the new, state-controlled authority. *See* 49 U.S.C. §§ 44702 and 44706(a). For now, though, the status quo has been maintained.

The Mississippi takeover bill is part of a trend.

In 2013, the North Carolina legislature tried to take the City of Charlotte's airport. "Republican-led state legislators said the move was needed to protect the airport from

meddling by the city, while city officials called the move a power grab." Ely Portillo, *Charlotte Wins Control of Airport*, Governing (Oct. 14, 2014). Then in 2019, a chamber of the Georgia legislature voted to take the City of Atlanta's airport, the world's busiest, and transfer it to a state-controlled entity. Kelly Yamanouchi & Greg Bluestein, *Georgia Senate approves state takeover of Atlanta airport*, Atl. J.-Const. (Mar. 7, 2019). The trend has been studied by academics, and even resulted in some federal legislation. *See* Can Chen et al., *Why did states fail to take control over city-owned airports? A tale of three cities*, 110 J. Air Transp. Mgmt. 102423 (2023); Kelly Yamanouchi, *Provision to prevent state takeover of ATL airport included in federal FAA law*, Atl. J.-Const. (May 23, 2024). It may expand into other jurisdictions or change in other ways as this case continues.

Today's motion concerns the last three counts of the operative complaint.

In **Count V**, all plaintiffs claim that § 61-3-6 violates the local and special legislation provision (§ 87) of the Mississippi Constitution. In **Count VII**, Jackson's Mayor and City Councilmembers, in their individual capacities and on behalf of those situated similarly, claim that § 61-3-6 violates the Equal Protection guarantees of the Mississippi and United States Constitutions. And in **Count VIII**, Jackson's Mayor and City Councilmembers, again in their individual capacities and on behalf of those situated similarly, claim that § 61-3-6 violates the substantive and procedural Due Process protections of the Mississippi and United States Constitutions.[1]

---

[1] Count VIII overlaps with the remaining allegations of Count III, so we will simplify and group them in Count VIII. Count VI, meanwhile, is not a standalone cause of action. Previously-dismissed counts remain dismissed for the reasons provided in earlier Orders.

The State Defendants and Rankin County now seek to dismiss these counts under Federal Rule of Civil Procedure 12(b)(1) "and/or" 12(b)(6).[2] They argue that the state-law causes of action should be sent to state court, while the federal causes of action should be dismissed. The plaintiffs oppose the motions. The arguments will be discussed below.

## II.    Legal Standards

### A.    Lack of Subject Matter Jurisdiction

Federal Rule of Civil Procedure 12(b)(1) permits parties to seek dismissal of lawsuits for "lack of subject-matter jurisdiction." It is a way to argue that the court lacks the "very power to hear the case." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981) (citation omitted).

"Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citations omitted).

"A motion to dismiss for lack of subject-matter jurisdiction should only be granted if it appears certain that the plaintiff cannot prove any set of facts in support of his claims entitling him to relief." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 287 (5th Cir. 2012) (citation omitted).

### B.    Failure to State a Claim

Federal Rule of Civil Procedure 12(b)(6) permits parties to seek dismissal of lawsuits that fail "to state a claim upon which relief can be granted."

---

[2] In what follows the Court will refer to the movants as "the State Defendants."

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In evaluating Rule 12(b)(6) motions, the Court must accept all well-pleaded factual allegations as true and draw reasonable inferences in favor of the plaintiff. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). The task "is to determine whether the plaintiff has stated a legally cognizable claim . . . , not to evaluate the plaintiff's likelihood of success." *In re McCoy*, 666 F.3d 924, 926 (5th Cir. 2012) (citation omitted).

## III.    Discussion

The Court divides the analysis between the state-law claims and the federal claims.

### A.    The Plaintiffs' State-Law Claims

The plaintiffs allege that the airport takeover statute violates three parts of the Mississippi Constitution: the local and special legislation provision, its Equal Protection guarantee, and its Due Process clause.

Section 87 of the Mississippi Constitution states, in relevant part:

> No special or local law shall be enacted for the benefit of individuals or corporations, in cases which are or can be provided for by general law, . . . and in all cases where a general law can be made applicable, and would be advantageous, no special law shall be enacted.

Miss. Const. art. 4, § 87. This kind of clause, found "in most state constitutions," is designed to prevent a state legislature from "creating an irregular system of laws, lacking state-wide uniformity." Osborne M. Reynolds, Jr., Local Government Law 101-02 (3d ed. 2009).

The Mississippi Constitution has no explicit Equal Protection Clause, but it is well-established that Mississippi law "finds an equal protection component in its Due Process Clause." *Stallworth v. Bryant*, 936 F.3d 224, 227 n.5 (5th Cir. 2019) (quoting Professor Jackson's *Encyclopedia of Mississippi Law* and citing Mississippi Supreme Court precedent).

Mississippi's Due Process Clause, meanwhile, states that "[n]o person shall be deprived of life, liberty, or property except by due process of law." Miss. Const. art. 3, § 14. This clause may "prevent the state's acquiring without compensation municipal property held in a private (or 'proprietary') capacity." Reynolds, *supra*, at 92.

The State Defendants' argument today is procedural. They say these claims should be litigated in state court rather than federal court.

This Court raised this issue with the parties in February 2017 via a request for supplemental briefing. *See* Docket No. 104. The parties then asked for and received more time to consider the pros and cons of proceeding here. And when they returned with their response in March 2017, the State Defendants said that they "specifically waive their Eleventh Amendment immunity . . . which would otherwise bar the intervenor-plaintiffs' current state law claims asserted in this matter, therefore, the Court may adjudicate those particular claims." Docket No. 121 at 1-2. Their supplemental filing even enumerated these counts as causes of action that could be adjudicated in this matter. *Id.* at 2.

The State Defendants now tire of being here. They complain that this "dispute has consumed the Court's, the Fifth Circuit's, and the parties' resources for over eight years (so far)." Docket No. 476 at 1. The concern is understandable. Many seasons have come and gone. But the length of delay is not a grievance the State Defendants can persuasively lodge against these counts.

The State Defendants made their choice eight years ago. If they had proposed a different path then, the parties would have commenced the parallel litigation in state court, presumably in Hinds County, which might well be over by now—although there is no guarantee. Regardless the State Defendants didn't do that. They weighed their options. They got what they asked for: a federal forum. They cannot now complain about the consequence of their representation--their strategic choice.

The law supports this conclusion. Although future dispositive motions could reveal "novel or complex issue[s] of State law," any such issues do not "substantially predominate[] over" the federal causes of action, which are in fact moving forward. 28 U.S.C. § 1367(c). There is no "exceptional circumstance[]" inherent in holding the State to its previous representation, at least not one that warrants declining jurisdiction. *Id.* § 1367(c)(4); *see Mendoza v. Murphy*, 532 F.3d 342, 347 (5th Cir. 2008) (affirming retention of supplemental jurisdiction where party "expressly stated in their federal court pleadings" that supplemental jurisdiction was appropriate). And declining supplemental jurisdiction at this point, "after investing a significant amount of judicial resources in the litigation," constitutes an abuse of discretion "even if" the remaining state-law claims are novel or complex. *Brookshire Bros. Holding v. Dayco Prods., Inc.*, 554 F.3d 595, 602, 603 (5th Cir. 2009) (collecting cases).

Because the State Defendants' argument has been forfeited, runs contrary to statute and precedent, and lacks support in "the common law factors of judicial economy, convenience, fairness, and comity," this part of their motion is denied. *Id.* at 603.

### B.   The Plaintiffs' Federal Claims

The Court will proceed slightly out of order and start with Count VIII, the individual plaintiffs' federal due process claim.

### 1.    Due Process

The State Defendants urge dismissal of this cause of action, arguing that none of these individuals has a property interest in the Jackson–Medgar Wiley Evers International Airport. The plaintiffs respond that they have a kind of property interest in the airport, in that their taxes support bonds that funded it. They add that their due process rights are impaired because § 61-3-6 singles them out unlike any other citizenry in Mississippi.

Upon review, the Court is persuaded that this federal due process claim is duplicative. The taking-of-our-property-without-compensation theory might be viable under the due process clause of Mississippi's Constitution. *See* Reynolds, *supra*, at 92. The we've-been-singled-out theory, meanwhile, is essentially the same claim the plaintiffs advance under § 87 of the Mississippi Constitution—the local and special legislation provision. It is not clear what the federal due process claim adds.

It is true that some state laws violate both the Due Process and Equal Protection Clauses. *See, e.g.*, *Loving v. Virginia*, 388 U.S. 1, 2 (1967). These strands of the Fourteenth Amendment "are connected in a profound way." *Obergefell v. Hodges*, 576 U.S. 644, 672 (2015). "In any particular case one Clause may be thought to capture the essence of the right in a more accurate and comprehensive way, even as the two Clauses may converge in the identification and definition of the right." *Id.*

Given *Loving* and *Obergefell*, it may ultimately be a fool's errand to categorize and silo the aspects of a plaintiff's constitutional injury into distinct legal theories. It is enough to say that, on this record, the Court believes that the plaintiffs' other causes of action render the federal due process claim unnecessary. We can get to the heart of the matter without it. This claim is, therefore, dismissed.

### 2.    Equal Protection

Next up is the federal component of Count VII. There, the individual plaintiffs claim a violation of the Fourteenth Amendment's Equal Protection Clause.

The State Defendants open by asserting that the Fifth Circuit's September 2019 decision ordered dismissal of this claim. *See* Docket No. 388. That appeal concluded that the individual JMAA Commissioners who issued subpoenas to certain non-party state legislators lacked standing to pursue Count VII. *Id.*

This Court does not agree that the 2019 decision compels dismissal of the Equal Protection claim at issue here. The Fifth Circuit's decision did not hold that the Mayor and City Councilmembers could not pursue that count. The parties here are different plaintiffs with different interests and injuries than those at issue in the 2019 decision. Their claim remains pending.

The issue today is whether the Mayor and City Councilmembers, acting in their individual capacities, have standing to pursue an Equal Protection claim under the United States Constitution. That analysis starts with the basics of standing.

### a.    Standing

The Constitution says, "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority." U.S. Const. art. III, § 2. It goes on to give the judiciary power to hear "all Cases affecting Ambassadors," "all Cases of admiralty and maritime Jurisdiction" and several different kinds of "Controversies." *Id.*

The Founders' insertion of the word "all" in front of the word "Cases" suggests a broad view of the judicial power.[3] The Supreme Court has nevertheless read the words differently. Over the decades, it has issued a series of decisions that omit the word "all" from this part of the Constitution and instead define "Cases" and "Controversies" narrowly—as *limits* on the judicial power. *See, e.g.*, *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992); *Allen v. Wright*, 468 U.S. 737, 750 (1984); *Flast v. Cohen*, 392 U.S. 83, 94 (1968).

The Supreme Court calls these limits "standing." To keep the judiciary in its proper place, the theory goes, courts may not adjudicate a dispute unless the plaintiff has standing.

A plaintiff has standing when they demonstrate that: (1) they "suffered an injury in fact that is both concrete and particularized and actual or imminent, not conjectural or hypothetical"; (2) their injury is "fairly traceable to the challenged action of the defendant, meaning that there must be a causal connection between the injury and the conduct complained of"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Brown*, 600 U.S. at 561 (cleaned up).

---

[3] One need not resort to a dictionary to understand that ordinary meaning. "All means all." *Halliburton, Inc. v. Admin. Rev. Bd.*, 771 F.3d 254, 266 (5th Cir. 2014). Judges cannot simply ignore the word, either, since that would violate "the elementary canon of construction which requires that effect be given to each word of the Constitution." *Knowlton v. Moore*, 178 U.S. 41, 87 (1900). As the Supreme Court has said elsewhere, "people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 674 (2020); *see District of Columbia v. Heller*, 554 U.S. 570, 634 (2008) ("The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon."). For some reason, though, those principles haven't applied to standing doctrine. The same disconnect appears when one compares the Supreme Court's decisions grounding standing in "policy considerations," *Flast*, 392 U.S. at 97, to other, more recent decisions recognizing that the Justices "inevitably swerve out of our lane when we put policy considerations in the driver's seat," *Patel v. Garland*, 596 U.S. 328, 346 (2022). If the latter set of cases now chart the truer course, a rigid standing doctrine will have to yield to the authoritative text.

This conception of standing "is surprisingly novel. It has no support in the text or history of Article III." Cass R. Sunstein, *What's Standing After* Lujan? *Of Citizen Suits, "Injuries," and Article III*, 91 Mich. L. Rev. 163, 166 (1992). "None of the delegates to the Constitutional Convention used the terms 'standing,' 'injury' or 'personal stake' in an Article III sense." James Leonard & Joanne C. Brant, *The Half-Open Door: Article III, the Injury-in-Fact Rule, and the Framers' Plan for Federal Courts of Limited Jurisdiction*, 54 Rutgers L. Rev. 1, 5 (2001).[4] "Thus, prima facie, all this looks like elaborate nonsense." Hannah Arendt, *Personal Responsibility Under Dictatorship*, *in Responsibility and Judgment* 17, 19 (Schocken Books 2003) (1964).[5]

Some judges may embrace standing because they fear judicial encroachment into the proper authority of the political branches. Other judges, meanwhile, perhaps endorse a rigid view of standing because they may believe that some people do not deserve to be in federal court. Those judges have what has been aptly termed "a fear of too much justice." *McCleskey v. Kemp*, 481 U.S. 279, 339 (1987) (Brennan, J., dissenting).

Regardless of why it has done so, the truth is that the Supreme Court "has transmuted standing . . . into a judicial weapon." Harold J. Krent, *Laidlaw: Redressing the Law of Redressability*, 12 Duke Envtl. L. & Pol'y F. 85 (2001); *see also* Oliver A. Houck, *Arbitrary and Capricious: The Dark Canon of the United States Supreme Court in Environmental Law*, 52 Geo. Envtl. L. Rev. 51, 70 (2020). Armed with such a malleable doctrine, judges "uphold standing

---

[4] History might in fact cut the opposite way. The Supreme Court has admitted, for example, that "the power of English judges to deliver advisory opinions was well established at the time the Constitution was drafted." *Flast*, 392 U.S. at 96.

[5] Arendt continued, "when many people, without having been manipulated, begin to talk nonsense, and if intelligent people are among them, there is usually more involved than just nonsense." People in her era were motivated to talk nonsense by fear, she thought. Perhaps something like that is true here.

with greater frequency when they sympathize with claims on the merits than when they do not." Richard H. Fallon, Jr., *The Linkage Between Justiciability and Remedies—and Their Connections to Substantive Rights*, 92 Va. L. Rev. 633, 640 (2006). Justice Brennan said this would happen—and he was right. *Allen*, 468 U.S. at 782 (Brennan, J., dissenting).

For proof, look no further than the standing case law built by judges in the U.S. Court of Appeals for the Fifth Circuit.

### b.    Standing in the Fifth Circuit

The Fifth Circuit's standing doctrine is a strange labyrinth. In theory, a judge navigates it by examining the plaintiff's alleged injury. In practice, however, it seems that the *kind of plaintiff*—rather than the kind of injury—determines whether a person gets their day in court. A few examples illustrate the point.

In 2019, environmental groups tried to stop the federal government from permitting additional oil and gas pollution in the Gulf of Mexico. *Ctr. for Biological Diversity v. United States Env'tl Prot. Agency*, 937 F.3d 533 (5th Cir. 2019). They said the government was violating the Clean Water Act. The Fifth Circuit concluded that the groups lacked standing. Although most of their identified members planned to visit or lived alongside the Gulf, they hadn't identified precisely *where* in the Gulf the oil and gas would be spilled. "The Gulf is huge," the court reasoned. *Id.* at 539. And as for one member who routinely made trips across the Gulf to search for oil spills? He lacked standing because "[n]o evidence suggests [his] boat trips and flyovers will coincide with the timing of discharges," and any pollution he might have found constituted a "self-inflicted injury." *Id.* at 540-41.

Compare that to another environmental decision. In 2023, the court asked whether an association of land and royalty owners could try to stop the federal government from

permitting a spent nuclear fuel storage facility in a West Texas county. *Texas v. Nuclear Regul. Comm'n*, 78 F.4th 827 (5th Cir. 2023), *cert. granted,* 145 S. Ct. 117 (2024). The county in question is larger than the State of Rhode Island, and the association "was created specifically to oppose the facility." *Id.* at 837. The Fifth Circuit concluded in a paragraph that the association had standing because "some of its members . . . live, work, or regularly drive close [to] the facility." *Id.* But the appellate court didn't define "close." It didn't dismiss *these members' injuries* because they might occur in a "huge" place. And we don't know why driving by that facility wouldn't constitute a self-inflicted injury.

Here's another pair.

In 2002, the Fifth Circuit considered whether an association of manufacturers' representatives could sue Wal-Mart for tortious interference with its members' contracts. *Friends for Am. Free Enter. Ass'n v. Wal-Mart Stores, Inc.*, 284 F.3d 575, 576 (5th Cir. 2002). The court found that the association lacked standing. Although the association had alleged that Wal-Mart's "policy improperly interferes with multiple, specific contracts between individual representatives and their manufacturers," at the motion to dismiss stage, it "refused to identify its members or to produce the specific contracts that [Wal-Mart] allegedly was interfering with." *Id.* at 576-77. That was a fatal flaw. The Fifth Circuit said there was "no way to resolve such fact-specific tort claims without participation of the individual members of the association." *Id.* at 577.

A few years later, however, the Fifth Circuit considered whether the Association of American Physicians and Surgeons had standing to sue the Texas State Board of Medical

Examiners.[6] *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 553 (5th Cir. 2010). The association too had filed its suit on behalf of "unnamed members." *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, No. A-08-CV-675-LY, 2009 WL 10701176, at *3 (W.D. Tex. Sept. 25, 2009). No problem here, though. *This* association had standing because "a small but significant sample of" its members could provide evidence to "establish a pattern" of the Board's "misdeeds." *Ass'n of Am. Physicians & Surgeons*, 627 F.3d at 553.[7] The *Wal-Mart* case, the court added in a footnote, was not "particularly instructive." *Id.* at 551 n.3.

The list goes on. When the State of Colorado passed a law invalidating local protections for gay and lesbian citizens, the U.S. Supreme Court held it to be a violation of the Fourteenth Amendment. *See Romer v. Evans*, 517 U.S. 620 (1996). The Colorado law "seems inexplicable by anything but animus toward the class it affects," the Court reasoned. *Id.* at 632. The plaintiffs' standing to challenge the law was so obvious it wasn't mentioned once.

But when the State of Mississippi did precisely the same thing in 2016, the Fifth Circuit refused to halt the law. The gay and lesbian Mississippians hadn't demonstrated "certainty that any member of an affected group will suffer an injury." *Barber v. Bryant*, 860 F.3d 345,

---

[6] The Association has been described as "a fringe group," Jessica Glenza, *The US doctors taking Trump's lead on hydroxychloroquine–despite mixed results*, The Guardian (May 24, 2020), because it has "falsely link[ed] the measles, mumps and rubella vaccine to autism in children" and taken other anti-vaccine positions that "do not represent the views of most physicians," Matt Motta and Timothy Callaghan, *The 1 In 10 U.S. Doctors With Reservations About Vaccines Could Be Undermining The Fight Against COVID-19*, The Conversation (Apr. 5, 2022).

[7] It's interesting to compare this last holding with the Fifth Circuit's other "pattern" precedent. In cases alleging police misconduct, for example, the Fifth Circuit has described plaintiffs' allegations of a pattern of *misdeeds* as "vague and barren of factual support" and "[a] hodge-podge of unrelated allegations, . . . isolated examples of, at most, deficient performance or bad judgment." *Verastique v. City of Dall.*, 106 F.4th 427, 432 (5th Cir. 2024). When one plaintiff alleged "twenty-three examples of arrests conducted by Precinct Seven officers that resulted in criminal charges later dismissed for lack of probable cause," the Fifth Circuit found them "of no use." *Johnson v. Harris Cnty.*, 83 F.4th 941, 947 (5th Cir. 2023). In another matter, meanwhile, it concluded that "27 incidents of excessive force over a period of four years do not reflect a pattern." *Peterson v. City of Fort Worth*, 588 F.3d 838, 852 (5th Cir. 2009).

358 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 652 (2018). The *Romer* decision was no impediment. Because the Supreme Court's decision in *Romer* didn't mention standing, the Fifth Circuit said it was "not bound to find standing in a similar circumstance."[8] *Id.* The Mississippi law is in effect today.

At times, the Fifth Circuit even articulates the basic doctrine in opposite ways. In one of its decisions in this matter, the appellate court dismissed JMAA board members' Equal Protection claim because "[t]he plaintiffs cite no precedent supporting their theory." *Stallworth*, 936 F.3d at 231. Five months later, though, the Fifth Circuit let Anglo voters bring an Equal Protection claim despite similar problems. "Standing is not a pop quiz administered by able defense attorneys to unsophisticated plaintiffs," and therefore, a "Plaintiff's inability to explain the legal theory underlying her vote dilution claim is not fatal." *Harding v. Cnty. of Dall.*, 948 F.3d 302, 307 (5th Cir. 2020). Both cases alleged governmental race discrimination, but only one was allowed to proceed through the courthouse doors.

It is this Court's duty, of course, to apply existing law to every dispute no matter whether that law seems confused, subjective, or results-oriented. The Court will endeavor to do so

---

[8] The Fifth Circuit has rejected as "incorrect" the notion "that lower courts can infer standing from the Supreme Court's decision in similar . . . cases where the issue was not ruled on by the Court." *Doe v. Tangipahoa Par. Sch. Bd.*, 494 F.3d 494, 498 (5th Cir. 2007) (en banc). The Fifth Circuit draws support for that proposition from a series of Supreme Court cases. *See id.*

To be sure, the Supreme Court "has never considered *itself* bound by prior *sub silentio* holdings when a subsequent case finally brings the jurisdictional issue before" it. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 63 n.4 (1989) (cleaned up and emphasis added). That makes sense. The Supreme Court can change its mind. *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 262, 292 (2022) ("If the rule were otherwise, erroneous decisions like *Plessy* and *Lochner* would still be the law."). But it's different for the Courts of Appeals and the District Courts. We are required to apply faithfully every Supreme Court decision and the Supreme Court's "resolution of . . . issue[s] necessary to the decision." *Will*, 491 U.S. at 63 n.4. It follows that the Fifth Circuit was required to follow *Romer*'s implicit finding of standing when it heard the analogous Mississippi case. After all, when it decided *Romer* in 1996, the Supreme Court was well-aware of what it was doing—having told us just a few years earlier that "lack of standing" was a "question the court is bound to ask and answer for itself, even when not otherwise suggested." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 547 (1986) (citations omitted).

below. In doing so, it will keep a firm eye on the injuries alleged rather than the presumed ideologies or political affinities of the plaintiffs.

### c.      Standing Here

Again, today's plaintiffs must demonstrate that they: (1) "suffered an injury in fact that is both concrete and particularized and actual or imminent, not conjectural or hypothetical"; (2) their injury is "fairly traceable to the challenged action of the defendant, meaning that there must be a causal connection between the injury and the conduct complained of"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Brown*, 600 U.S. at 561 (cleaned up).

The last two elements are plainly present here. Any cognizable injuries these plaintiffs will suffer will be due to the actions of the defendants in appointing the takeover agency's board, and a court order could redress the injuries. What's disputed is the first element. Have any of these individuals "suffered an injury in fact that is both concrete and particularized and actual or imminent, not conjectural or hypothetical"? *Id.*

In strictly economic terms, the Jackson airport is a tangible asset owned by the taxpayers of the City. The taxpayers bought the land, developed it with a series of structures and runways, sustain it through JMAA, and control JMAA through the levers of the democratic process. The airport's seizure by the State of Mississippi represents, in this light, a government taking of property—one that so far has lacked the remedy of "just compensation" that the Fifth Amendment provides individuals. This Court does not believe that the State has ever attempted to pay City taxpayers for the airport land or its improvements.

In economic terms, then, each plaintiff (and indeed each City taxpayer) has been divested of a roughly 1/173,514th share of valuable property.[9] Is that enough for federal-court standing?

The answer is probably not. The Supreme Court has long "rejected the general proposition that an individual who has paid taxes has a continuing, legally cognizable interest in ensuring that those funds are not *used* by the Government in a way that violates the Constitution." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 134 (2011). The parties to this suit have not pointed to case law indicating that State seizures of municipal property fall into an exception to this rule. The Court considers this kind of path not viable.

Yet that is not the end of the analysis. The Equal Protection Clause protects against more than economic discrimination. Birthed in the aftermath of the Civil War, the Clause was intended to end the pervasive legal racism that had plagued the colonies-turned-Nation for generations. "To its proponents, the Equal Protection Clause represented a foundational principle—the absolute equality of all citizens of the United States politically and civilly before their own laws." *Students for Fair Admissions, Inc. v. Pres. & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023) (cleaned up). "Above all else," the Supreme Court once wrote, "the framers of the Civil War Amendments intended to deny to the States the power to discriminate against persons on account of their race." *Oregon v. Mitchell*, 400 U.S. 112, 126 (1970).

Today's plaintiffs invoke that pillar of reconstructed American law. They say the State took Jackson's airport with "discriminatory purposes." Docket No. 473 at 40. At the time the

---

[9] The population figure is drawn from the operative pleading.

State passed this law, the plaintiffs observe, Jackson's airport "was the only airport in the State of Mississippi managed and operated by a Board comprised solely of African Americans, and is owned by the City of Jackson, a municipality consisting of an overwhelming majority of African Americans." *Id.* at 41. The plaintiffs point out that although 79% of Jackson's citizens are Black,[10] a majority of the new Board's members would be appointed by leaders of the State of Mississippi, Madison County, and Rankin County—all of which are majority-white, and elect mostly white people. *Id.* at 39-40, 44.[11] "The end result of Senate Bill 2162 is unlawful and violates even the most basic sense of equal protection," the plaintiffs conclude. *Id.* at 42.

The legal standard requires the Court to accept as true these plausible factual allegations and draw reasonable inferences in favor of plaintiffs. And after so doing, the Court concludes that if the plaintiffs ultimately prove that the State of Mississippi considered race when it passed a law that targeted the City of Jackson and only the City of Jackson, then yes, that would violate the guarantee of Equal Protection.

The government can wield a lawful power for many reasons, to be sure, but "there are some reasons upon which the government may not rely." *Elrod v. Burns*, 427 U.S. 347, 360 (1976). One of those is race. The government simply cannot make race-based distinctions, which "are by their very nature odious to a free people whose institutions are founded upon

---

[10] 2024 Census data indicate that this figure has crept up to 81.8%. Jackson has "the highest concentration of Black residents in cities with more than 150,000 people." R.L. Nave, *Mississippi's efforts to take over America's Blackest city: A brief history*, Reckon (Feb. 15, 2023).

[11] According to 2024 Census data, the white population of Madison County remains at 57% while the white population in Rankin County has dipped slightly, but is still nearly 74%. U.S. Census Bureau, Quick Facts, https://www.census.gov/quickfacts/fact/table/madisoncountymississippi,rankincountymississippi/PST045224.

the doctrine of equality." *Rice v. Cayetano*, 528 U.S. 495, 517 (2000) (quotation marks and citation omitted). Racial considerations "demean[] the dignity and worth" of the targeted group and, at the same time, "intentionally allocate preference to those" with "little in common with one another but the color of their skin." *Students for Fair Admissions*, 600 U.S. at 220.

Here, the Equal Protection injuries the plaintiffs allege are concrete. The allegedly-racist conduct of the State Defendants has tangible and intangible effects.[12] The transfer of land and assets is as concrete as it gets. The injuries are actual or imminent. The statute was passed and signed into law, and the defendants were on the cusp of appointing people to constitute the new takeover Board until this litigation commenced. The injury is hardly hypothetical.

That leaves the "particularized" requirement. Taxpayer standing is foreclosed precisely because individual taxpayers "lack[] the kind of particularized injury required for Article III standing." *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 600 (2007). A person's interest in their taxes, once paid to the government, "is shared with millions of others" and "is comparatively minute and indeterminable." *Id.* Does that foreclose the plaintiffs' Equal Protection claim about the airport takeover?

True, plaintiffs lack standing to complain about matters common to "all citizens." *Lance v. Coffman*, 549 U.S. 437, 441 (2007). Those plaintiffs with an "undifferentiated, generalized grievance about the conduct of government" have "no particularized stake" in a case or controversy. *Id.* at 442.

---

[12] This fact distinguishes our case from *Moore v. Bryant*, the Confederate flag case, where the alleged injury was stigmatic. *See* 853 F.3d 245, 250 (5th Cir. 2017).

At the same time, though, plaintiffs can (and often do) file suits in which they represent the interests of a larger group of persons because they are *among* those individuals who have demonstrated "disadvantage to themselves." *Baker v. Carr*, 369 U.S. 186, 206 (1962). If those injured persons can bring suit, then an injured person in a city targeted by race discrimination can also bring suit. The important part is the plaintiff's allegation that they live in the affected jurisdiction and, by that residency, have been personally injured. *See Romer*, 517 U.S. at 632.

Imagine for a moment the opposite conclusion. Articulate how "standing," a judge-made doctrine of the late 20th century, can prevent what the text, history, and common sense of the Fourteenth Amendment require. How it could bar the doors of the federal courthouse to Black Mississippians challenging the majority-white Mississippi legislature's attempt to seize their city's property, given a Reconstruction amendment that sought to protect Black Mississippians' property. It's just not tenable. *See Mitchell*, 400 U.S. at 126.

No, the better-reasoned conclusion here is to find standing, wielding the doctrine in its most appropriate and "'traditional" role of "protecting . . . minorities against impositions of the majority.'" Gene R. Nichol, Jr., *Justice Scalia, Standing, and Public Law Litigation*, 42 Duke L.J. 1141, 1147 (1993) (quoting Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 894 (1983)).[13]

---

[13] One last thing bears mention. The State Defendants have not raised a lack-of-standing argument as to the plaintiffs' surviving state-law claims. They put all their eggs in the basket of supplemental jurisdiction, an argument that was ultimately found unavailing. Because this is "litigation involving state rights but commenced in federal courts," however, "state law ordinarily should apply." Wright & Miller, 13B Fed. Prac. & Proc. § 3531.14 (3d ed. updated April 2020). And Mississippi's "liberal" standing doctrine is "more permissive" than the federal judiciary's. *Van Slyke v. Bd. of Trs. of State Institutions of Higher Learning*, 613 So. 2d 872, 875 (Miss. 1993). No matter what happened with the federal causes of action, then, the parties would have to litigate to conclusion the plaintiffs' state-law claims. It is now time to do that.

**IV.    Conclusion**

The motions to dismiss are granted in part and denied in part. The parties shall contact the Magistrate Judge to obtain a final scheduling order.

**SO ORDERED**, this the 23rd day of May, 2025.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE